Good morning. We have a fairly long docket, so I think we'll dispense with the reading of the entire docket. And Ms. O'Keefe, would you announce our first case for argument, please? The first case for argument is United States v. Austin Mallory, Requan Patton, and Uri Green, Jr. Okay, Mr. Kleinfeld? Yes, Your Honor. Good morning. May it please the Court, my name is Nick Kleinfeld. I'm here on behalf of Defendant Austin Mallory. And while we think all of our arguments are strong ones, given the limited amount of time one has on oral argument, we'd like to cut straight to the alleged chase and talk about the improper exclusion of Durante Rankin's testimony. Specifically, the District Court erred in applying the wrong legal standard. Quite clearly, the District Court applied the Moorland Seventh Circuit primary purpose test in excluding Durante Rankin's testimony and excluded it on the basis that the District Court believed that our intent was to call him just for the purpose of impeaching him. That was clearly in contravention of this Court's decision in Buffalo, which disavowed that test. And the purpose of applying the wrong analysis was not just, we believe, legal error in terms of applying the wrong standard, but it distorted the focus of the analysis. What, quite clearly, the District Court was looking for there was to discern counsel's intent. The District Court mentioned good faith in her ruling, was trying to determine our intent in calling Durante Rankin. And this Court, in both Logan and Buffalo, said that's not the proper focus. In addition, the District Court failed to consider the value of the impeachment, of the testimony with impeachment. Because of this, it also improperly credited the government's report of what Durante Rankin would say, which we'll discuss in a minute. For those reasons... Did we even know if he would testify as opposed to take the Fifth Amendment? We don't, Your Honor. And we believe that goes to the corroboration of his 804 statement. And he had always previously said that your client was driving, right? No, he had never... Except maybe to Turner, who said he said something different, right? Right. What happened is, Bauer Turner, who is the government's witness, had a cooperation agreement with the government, said not just once, but twice to the government, in back-to-back occasions, that they switched. That Rankin told him that they switched. And keep in mind, this is somebody who is a fellow gang member. This is the day after. They're talking about what happened. But other than Turner, he had consistently told the police officers, or the police, or anybody else, that your client was the driver. I don't think that's correct, Your Honor. I think that the only other time that he was ever asked was that night of the shooting. And I don't believe he really said much of anything. I think he gave some uncredible statements that he was sleeping or something like this. But he denied liability at that point, but never talked to again. Bauer Turner then, in court, before a judge, sworn testimony, subject to cross-examination, against his own interest, implicates his friend and fellow gang member and says, yes, that's what he told me. Rankin told me that they switched seats. All Rankin did was, after being arrested, tracked down on a material witness warrant, and taken to the U.S. Attorney's Office, after being given a lawyer, after this case had been pending some time, and after he clearly realizes the implications of what it would mean if he's driving, because that's what my client has been charged with, attempted murder. He says, for obvious reasons, no, I wasn't driving. You know, I think you have a good argument, actually, that the district court's analysis was unsound. I think that there's a good argument on that. But I wonder whether we affirm anyways on one of two grounds, which is we either affirm on the fact that it's harmless error, given all the other evidence, which is what the district court focused on, or that there weren't, what is it, substantial, sufficiently corroborating circumstances. The district court, again, balanced the evidence, but there's enough other stuff to show that it is not really a trustworthy statement. And so in addition, what I mentioned is the fact that under the abusive discretion standard, this case is even better than the facts in Buffalo. Because keep in mind, in Buffalo, they said, yes, it wasn't harmless error. And in that case, it was the same situation where the defendant's pointing to an alternative suspect. But in that case, there was more than one assailant. In this case, it was either Mallory or Rankin. It's even more important, his testimony, than it was in Buffalo. We have a stronger argument. But the problem with that is Mallory admitted to being the driver. And that seems to me to make it a pretty big hill to climb for Rankin's statement, which is inconsistent, at least with one other statement he made to overcome that sort of confession. If the jury could have heard Durante Rankin's testimony, they would have understood why Austin Mallory had accepted responsibility for driving that day. And that is a separate error in terms of prior inconsistent statement. The second thing I would like to point out is that unlike in Buffalo, where the district court judge actually allowed the witness to testify anyway, just said, look, I'm not going to admit the other witness about the prior inconsistent statement. We didn't get to do that. The judge foreclosed all testimony of Rankin. That could be a completely separate error. The third error is the corroborating circumstances that Your Honor mentioned, which gets to, and we can address that in a rebuttal, but we believe that's still yet a separate ground for resistance. Well, let me ask you about that because that's important to me, and I know I'm eating into some rebuttal time. But the corroborating circumstances, you have the inconsistent statements, number one, by Rankin, and then you have potentially Bauer Turner, who isn't exactly the most credible witness in the world. And so I wonder if the district court exercised discretion appropriately to exclude that particular evidence. Your Honor, what had happened was Bauer Turner was the government's own witness. The government relied on him for so much during this case. And it would be against his interest to inculpate Rankin, who is not being charged in this case, and it would clearly be exculpatory to Mallory, who was. And Bauer Turner was subject to cross-examination under sworn testimony in court. Rankin, all they have is, we talked to him, and he denied criminal liability. Of course he's going to deny criminal liability. There is no way to equate those two statements. Bauer Turner is so much stronger than that. In addition, you have the unique circumstances, I see my time is up, but the unique circumstances of how he did not appear here, which clearly show that he was worried about more than just what he said to the government. Thank you, Your Honor. Thank you, Mr. Kleinfeld. May it please the court. My name is Keith Rigg. I represent Raekwon Patent. Good morning. Obviously we have four issues that I briefed on this case, the first one being the justification defense. The mourning of final arguments, and just before we did record on instructions, the district court decided that the defense of justification shouldn't be given. It's a little bit of an interesting procedural thing, because we're trying essentially an Iowa state crime in federal court, so we're relying on Iowa law. Helpfully, the Iowa Supreme Court, during the pendency of this appeal, cleared up the issue that the trial court was talking about. If Mr. Patent had a gun, he still had a right of self-defense, he just had to retreat. And what I think is important in this, this whole crime is one city block. And the entire time, he is in a trailblazer that's driving from east to west through that block. Somebody's shooting at them, and they're getting hit from behind. That's why the rear window is broken, that's why a passenger in the rear seat gets shot in the back of the head, that's why the rear license plate gets hit. All of his shell casings are after they drive that one block, and two people see him lean out of the car and shoot, and all of his shell casings are a block away. He shot after they traveled that block. They were retreating the entire time. So he still had a defense. He may have had defined alternate means, which means that he should have tried to retreat, but they were in fact retreating. That got ignored by the district court. The Iowa Supreme Court has thankfully said, you still have that right of self-defense even if you don't have the right to stand your ground. So after trial, they came up with two different reasons. One being that the fact that he pled guilty to conspiracy to commit a forcible felony in Iowa, that that was a forcible felony and that the justification chapter that would preclude a defense because it was itself a forcible felony. But it's not. Legally, that's incorrect. Forcible felonies in Iowa are important because you can't get a deferred or suspended sentence if you get convicted. You have to go to prison. People go get probation off of conspiracy to commit a forcible felony all the time. I've been practicing criminal law in Iowa 40 years. That happens. That's why you see all of those cases where people complain they didn't get probation to an appellate court, and you never see them say, they always say no, it's not an abuse of discretion, but they never say there was no discretion, you have to go to prison. It's not a forcible felony. And then the third part was, well, there's just nothing to say we should have given justification. Other than the fact that somebody shot at them 14 times from behind as they kept traveling down a block. You get to defend yourself. One of the people in this car got hit in the back of the head by one of these shots. You get to shoot back. Shoot back at whom? That's for the jury to decide. That's the ultimate question for the jury to decide. If they're saying that he tried to attempt a murder, and what we're down to now is one person, Mr. Nelson, was he in effect shooting at Mr. Nelson? Since there were no bullet fragments or anything else found in the location where they searched for him to be. Or was he shooting at Mr. Nelson behind the vehicle? He would have been on the other side of the street. He would have gone to an area on the other side. So he was not behind the vehicle? I'm sorry? So he was not behind the vehicle? No. Well, I mean, the trailblazer is going past, so he would have been behind in that sense. But that's the question ultimately. Was Mr. Patton trying to shoot Mr. Nelson and attempting to murder him? Or was he shooting at somebody who may be completely different, maybe Mr. Nelson, maybe somebody else, because they were shooting at him first? That's the jury question that they never got to decide. Wasn't there also evidence, though, that this was a planned event, that before they got into the shootout, they armed themselves, went out looking for this and to do some retaliation for prior shootings, and therefore weren't they engaged in a felony? Conspiracy to commit a forcible felony. Well, just because that's the only thing they pled guilty to, that doesn't mean that that's the only possible crime. Right, but if you're arming yourself to commit a crime in the future, you haven't committed the crime yet. And the evidence here was all they had done was follow the car. There's no actual evidence that they were shooting at them before all of this started. So a jury could find, and by the way, a jury could find, since we don't know who it was that was shooting, that whoever was shooting was completely independent from what they were doing. So there should have been a defense. I'm eating into a little bit of a time, but I do want to mention one thing kind of in the back end that I didn't write about in the reply brief, and that's Agent Chafee's testimony. I think of this, if you were, for example, a ballet troupe, who during your days when you're not performing, go commit a series of bank robberies, would you have an expert explain the culture of ballet, or skateboarders, or football teams? Would that be in any way relevant? No, but this is about an enterprise, right? But those, in that case, would be the enterprise. Well, the ballet has nothing to do with the crime. In this circumstance, the enterprise has something to do with the crime charged. Does it? Yes, it's an element. If you're saying, okay, we're in a criminal gang, and here's generally how criminal gangs work, you're not explaining what that enterprise is. You're just saying generally they commit crimes, and that's the danger of it. And that's why I think that it's not relevant and should not have been admitted. Thank you. May it please the Court. I'm Julie Frank, and I represent Defendant Uri Green. Today, I will be just addressing the issues which I think are relevant to Mr. Green, which relate to the enterprise. And I concur in the comments that Mr. Rigg made with regard to whether or not this is a criminal enterprise, because a street gang is not necessarily a criminal enterprise. And Agent Chafee's testimony went to proof of a street gang, but didn't go to proof of an enterprise. The government charged the defendant with Vicar crimes, including attempted murder and weapons charges. When they did that, and they charged pursuant to Vicar, they bore the burden of proof beyond a reasonable doubt of all of the elements. So in order to prove a Vicar crime, the government must first prove there was an enterprise, or I'll just call it a group. There's a group, and it has to meet certain criteria, but there's a group. And that the group was engaging in racketeering activity, and that as consideration for an individual participating in the Vicar crime, they were either looking for something, a promise to pay, something of pecuniary value, or in this case, I guess, although there's no evidence of it, that the defendant was attempting to gain admission or increase his position in the enterprise. There's no evidence even that Mr. Green was part of OTB Only the Brothers, that he wanted to be part of Only the Brothers, or that even he was an associate of Only the Brothers and wanted admission. So those are the things the government has to prove in order to prove the Vicar crimes. In this case... Well, wasn't there witness testimony that he was an associate and that he wore the clothes and gave the gang signals and maybe participated in social media activities in support of the OTB? And that begs the question, Judge, what is an associate for purposes of the enterprise? Lots of people can be associates of a street gang, and they can be associates because they know a member and they hang out with a member. As a matter of fact, this court... Well, it goes beyond that, doesn't it? I mean, an associate would be more than I know someone, but as Judge Grunder pointed out, there was additional evidence here that he dressed like them, he participated in their social media activities. I mean, that's not knowing someone. I agree with you, that's not knowing somebody, but merely participating in some social media events, or they're not events, but social media that was like Only the Brothers, does not make him an associate for purposes of the enterprise because the enterprise has to have a specific purpose. That's the first thing that it has to have. And in this case, the government has alleged that the purpose of the enterprise was selling illegal drugs, getting things of value, and maintaining respect in the neighborhood. First of all, and I go through this in the brief, there's really not any evidence to support that OTB as a gang had those as purposes. What about the expert evidence that Mr. Patton is trying to argue the other way on? I mean, that's what makes this case so hard. There's some tension there. Exactly. There's some tension there, and associate is a really broad category. And what I looked at when I looked at Agent Chafee's testimony was that he was very clear that the business or the purpose of the enterprise is conducted in what we call the subset. And by that I mean there was testimony by Detective George that owning the brothers was a subset of heavy hitters, as was Money Gang, and that they somehow were subsets or affiliates with Vice Lords and I think it was the Bloods. So all those people are, quote, unquote, associates. They throw up some of the same gang signs. They hang out together. That does not mean they were part of the enterprise just because they might be the term associate. And that's why it is so broad. And at trial, the government presented no definition, no specific definition of associate so that anybody could be an associate. The jury could find that anybody could be an associate because there was no testimony as to what formed an associate. So it's like saying that every member of the Bloods or every member of the Vice Lords is an affiliate of OTB. But the problem is that Agent Chafee and members who were admitted members of OTB testified that the business of OTB was done in the subset, meaning done in OTB. So that the purpose that they've set out for OTB was done at the OTB level and that everybody who might be an associate is not a member of the enterprise. Wouldn't you tend to prove that circumstantially? I don't know. Maybe I'm wrong, but I don't think gangs have written spreadsheets where people pay dues and become members. So I think you would have to prove that circumstantially. I suppose there could be an instance in which you have a snitch that says, oh, yeah, he or she was a member. And so it kind of goes back to the earlier point. What should the government have done when there's no written spreadsheet and they can't get testimony identifying somebody as a member? I agree with you. But there was no evidence presented on how all of these people who were associates were associates of the enterprise. Just because they might have been associates of OTB, how were they associates and what was their relationship to the enterprise itself? And just briefly, I just want to change the subject because I'm just about out of time. But I do want to point out that there were two separate sets of crimes, some in May, which basically decimated OTB and most of their members were arrested. And the testimony was basically they didn't exist. They migrated to other groups. They didn't exist as OTB. They were not coordinated. And a group of uncoordinated individuals cannot form an enterprise. And that's actually what they were before May of 2020, but certainly after May of 2020. There were only a few individuals left. And my client was accused and convicted of an attempted murder and a weapons charge in December of 2020 when the evidence was clear there couldn't have been an enterprise. Detective George basically just dismissed that and said, oh, they were the same individuals doing the same things. They weren't the same individuals, and his testimony belies that. He said that members of OTB migrated to other groups and were part of other groups. And the name didn't simply change, but they went to Money Yang. And so that any crimes committed after May, if there was an enterprise that existed before May, any crimes that happened after May could not have been part of the enterprise, and my client could not have been convicted of the Vicar crimes because there was no enterprise that existed at that time. Ms. Frank, your time has expired. Thank you. Thank you. May it please the Court. I want to begin with addressing Austin Mallory's appeal and specifically the issue of Geronte Rankin's alleged statement. I think it's important to keep in mind that in this case Geronte Rankin failed to appear at trial. He had been subpoenaed. He was subject to a material witness warrant. The government ultimately decided not to call him as a witness. He remained subject to the subpoena and the material witness warrant, and he failed to appear. So why wasn't he unavailable? I've got to say I don't buy the district court's analysis on availability at all. I think, Judge Strass, the court's reasoning on unavailability was that to be subject to compulsory process, the witness has to offer material and favorable testimony to you to avail yourself of compulsory process. And the court determined that based on Geronte Rankin's denial that he had ever driven the trailblazer or switched seats with Austin Mallory that Austin Mallory did not have any reason to believe there was material and favorable testimony from Geronte Rankin. But doesn't that kind of seem strange when he was already subject to a subpoena and a material witness and he was viewed as a material witness and doesn't show up? Shouldn't that have been the end of the analysis? And then you can go on and talk about trustworthiness, which I think a lot of what you're saying is getting at. That's right, Your Honor, and that's where I wanted to turn. I wanted to start with the fact that he failed to appear because I think that distinguishes this case from one like Buffalo. Buffalo was a case where there's an assault and the defense wants to present evidence at trial that, no, this other guy actually was the assailant. And the other alleged assailant actually testified at trial. And then the defense wanted to admit prior inconsistent statements. I think it was two jailhouse snitches that said, well, that guy actually told me he did it. And the district court said, no, we're not going to let those guys testify to that prior inconsistent statement. Buffalo was decided under Rule 613B, which allows extrinsic evidence of prior inconsistent statements in certain circumstances. 613B isn't implicated here because Durante Rankin never took the stand. He never testified. So the issue of a prior inconsistent statement of a witness was not at issue. So I think that primarily distinguishes this case from Buffalo. And I think to Judge Strauss' point, I think that is why this issue is governed appropriately by Rule 804B3, which provides for a hearsay exception for statements against penal interest when the declarant is unavailable. And to Judge Strauss' point, regarding that exception, there's three requirements. Essentially, one is that they're unavailable. The second is that the statement was against penal interest. And third, that there are corroborating circumstances that clearly indicate the trustworthiness of the statement. And I think that's really where Mr. Mallory falters in this. We have, and I want to point out the standard of review, I think, is particularly important here. The district court's determination that a statement did not have clear indications of trustworthiness is reviewed for clear error. That's a factual finding that the district court made in this case. That's this court's decision in United States v. Cole, which I don't believe was cited in our brief, but I have the citation if the court would like it. I think when we look at then whether the district court's finding that the statement did not have hallmarks of trustworthiness, I think it's fair to say that the district court's finding was not clear error. Judge Grunder, you asked earlier if there was any other alleged statement by Mr. Rankin, or if he had ever said anything like this other than the alleged statement to Mr. Turner. And the answer to that is no. Mr. Rankin met with the government shortly before trial. He flatly denied ever driving the Trailblazer on May 10th of 2020. And he specifically denied ever saying otherwise to Fabrice Turner. So that's one issue with it. It is a single alleged statement. And then we also have the issue of Fabrice Turner's testimony. There was an offer of proof made at trial. He testified on cross-examination that he didn't know when or where this alleged seat switching took place. He acknowledged that it could have even happened at the mall before they left to pursue the Hyundai Sonata. Is that meeting with the government that you mentioned a second ago, is that part of the record? Yes, Your Honor. Well, to a degree, there was a written disclosure letter prepared by the government. I believe it's at docket number 347. That was after the meeting with Durante Rankin. A summary of the meeting was prepared and sent to defense counsel. Given the nature of the timing, it was close in time to the trial in those circumstances. We just want to get the information out as quick as possible. Just to follow up on the trustworthiness point, I think the district court went a little awry. The district court mentioned everything you mentioned. I think all of that is appropriate. But then when you start balancing the evidence where the district court said, well, but there's a lot of evidence that Mallory was in the driver's seat. And therefore, we're not going to allow that statement in. I don't think that's appropriate. You could have five statements that say otherwise. But this one statement could be really trustworthy. And you still should let it in. That's the whole point of the statement against penal interest. And so I wonder whether you're saying something slightly different than the district court or sort of taking a subset, which I think is a smart thing to do, or whether you think that the district court got this one exactly right and we should adopt its analysis wholesale. Well, I think, first of all, all the district court judges that I appear in front of get everything right all the time. Yeah, fair enough. Good answer. Other than that, Your Honor, I have thought about that. And I actually struggled to find a case talking about that fact, that is this a weighing of the evidence or is this we're just looking at the statement in isolation? And I didn't find anything that was really on point, Your Honor. I think what's important is that the alleged statement, the source of the alleged statement is Fabrice Turner. During this offer of proof, he doesn't really provide any real substance to this alleged statement. He doesn't know when it happened. He doesn't know where they switched seats. And then on cross-examination, he candidly acknowledged that Mr. Rankin was not clear at all about this alleged statement and then ultimately admitted that he didn't even remember exactly what Geronte Rankin said to him. I know Mr. Mallory, in searching for some kind of corroborating circumstances, points to Tehran Stenton's testimony, who is the guy who is seated in the middle of the backseat of the Trailblazer. It's important if you actually look at Tehran Stenton's testimony on direct, he testified that Austin Mallory was driving the Trailblazer. Tehran Stenton specifically testified that he saw nobody else drive the vehicle that day. And he specifically denied on redirect ever seeing Geronte Rankin drive the vehicle. So I think for those reasons, the record is really, it's this one stand-alone alleged statement against a lot of reasons to doubt that. And I think here we're talking about a hearsay statement. I think everybody acknowledges this would be a hearsay statement if Fabrice Turner came in and just recited some statement that Geronte Rankin allegedly made to him. And so that is why the rule, of course, requires corroborating circumstances that would give, clearly indicate the trustworthiness of the statement. And then to the extent, Judge Strass, that we do get to look at the other evidence, as the district court did in this case, I mean, I think that's where it really, if it weren't already, you know, lacking trustworthiness, we get to the point where we have a postmortem, well, first of all, a traffic stop where Austin Mallory climbs out of the driver's seat on video. We have a post-mortem interview where last I've checked, I think 27 times he says he was driving. And then he ultimately enters a guilty plea in state court where he admits under oath that he was driving the vehicle during the shooting. So for all those reasons, we think the district court did not clearly err in finding that the statement lacks sufficient indicia of trustworthiness. On that point, is our standard of review clear error or is an abuse of discretion as the trustworthiness point? Do you know? I do, Your Honor, and I referenced United States v. Cole. That is 525 F. 3rd 656. There, this court said, whether corroborating circumstances clearly indicate the trustworthiness of a statement is a question of fact that this court reviews for clear error. Okay. I wasn't sure if it applied to that. Thank you for clarifying. I wanted to address next the justification instruction issue that Mr. Rigg raised on behalf of Defendant Raekwon Patton. I wanted to start first with Iowa Code Section 704.13. That's the section that gives rise to this implied duty to retreat. Statutes kind of stated differently. It says if you are not engaged in illegal activity, there's no duty to retreat. In Balthazar, the Iowa Supreme Court said, well, the inverse of that is also true. If you are engaged in illegal activity, you have a duty to retreat. In this case, the district court ruled that Mr. Patton's use of force predated any retreat, and I think that finding is supported by the record. The evidence at trial showed that Mr. Patton was hanging outside of the window of the trailblazer firing a gun. The evidence established to Judge Cobb's question earlier, I believe you asked, shoot back at whom? The evidence showed that the Hyundai Sonata that Raishan Nelson and Allison Doyle were in was struck by gunfire. A .40 caliber projectile was found in the tire of that vehicle. That is precisely the kind of gun that Raekwon Patton was firing that day. He was the only one firing a .40 caliber weapon. So that would indicate that as he's hanging out the window, he's firing and hitting the intended victim. I just have a general question that's probably easy for you to answer. But as far as justification goes, it seems to me that this is an odd situation where he was being attacked from behind. And he's arguing he was justified in shooting at someone else. Can you work through that for me? How does that work under Iowa law? Well, I think you've accurately kind of set the scene. There's this alleged third person who law enforcement never determined who it was. There's nine millimeter casings on the north side of the road to the west of where Raekwon Patton was seen shooting back to the west. But I think the fact that the Hyundai Sonata was actually hit by gunfire, including from Mr. Patton's gun, goes right to the heart of the justification issue. To the extent there's this third assailant firing a weapon at the trailblazer, the justification defense would be as to that individual. It would not then also be a justification to shoot at the people that you just pursued across town for seven to eight minutes. And opposing counsel suggested that was a jury question. Do you agree with that? I don't, Your Honor, because I think under the statute, the district court determined that there was a duty to retreat, which I think Mr. Rigg has acknowledged there's a duty to retreat because Mr. Patton was engaged in unlawful conduct. And then the district court, I think, determined essentially as a matter of law that there was no retreat because the use of force as to the intended victims would not give rise to a justification defense. I also wanted to address the issue of the forcible felony. As Mr. Rigg acknowledged, Raekwon Patton pled guilty as a result of this set of facts to conspiring to commit a forcible felony. That being planning to commit a shooting on May 10th. The evidence indicated, as Judge Grunder alluded to, that Raekwon Patton and Braden Schaefer actually acquired these guns that morning. They then at the mall encountered a rival gang member and they then pursued him across town and ultimately engaged in a shootout. I think one other exception to the justification, this is 704.6 subsection 3, talks about who one who provokes the use of force by one's own unlawful acts is generally not entitled to a justification defense. And I think that kind of plays into the forcible felony aspect here in that they pursued these individuals, known opposition gang members across town while armed with guns. And for those reasons, we think the district court was correct to deny the justification defense. What about the fact that only the conspiracy part of it was what was charged in state court? Yeah, I'm glad you bring that up, Your Honor, because I think if you look at the Iowa Supreme Court's decision in Baltazar, I don't think we're limited to what he ultimately pled guilty to. And I think Judge Grunder made that point. In Baltazar, the Iowa Supreme Court kind of just runs through a list of Iowa offenses that the individual was committing in the course of this, what was ultimately a murder. They talked about that he was carrying weapons and he didn't have a permit for his weapon and going armed with intent, which I think those would also apply in this case. Certainly going armed with intent, I think because of a change in the law in Iowa, the carrying weapons part would no longer be a violation. But I don't think we're stuck with, I guess, the count of conviction, the fact that Raekwon Patton pled guilty only to conspiring to commit a forcible felony. I think we can look at the facts as they happened and determine if that was a violation of Iowa law and whether those facts would establish a forcible felony. I also did want to touch on our harmless error argument on the justification issue. Mr. Patton's entire defense at trial was essentially premised on this self-defense issue with this third unknown shooter. And I think that's clear if you look at Mr. Riggs' closing argument. He stated, the only person Mr. Patton was shooting at is whoever was shooting at him. He was reacting to being fired upon. He returns fire. They got fired upon and they did not shoot until being fired upon. So I think this issue is certainly presented to the jury. And I think implicit in the jury's finding, they found that Raekwon Patton attempted to murder Raishon Nelson. That would require a finding that he was not merely shooting at this unknown assailant who was allegedly firing on the trailblazers. So we think the harmless error piece of this is important as well. I wanted to address Raekwon Patton's issue with the district court's instruction on the purpose element of the Vicar. That goes to the section 1959. It talks about committing violent crimes to gain entrance to or maintain or increase your position in the enterprise. In this case, the district court instructed the jury that the government need not prove that it was the sole or predominant purpose. That instruction is consistent with the model instructions of numerous circuit courts. Mr. Patton requested an instruction that would have said that the purpose to maintain or increase position in the enterprise was the, I believe, substantial purpose. Now the statute, where we should begin, of course, just says the purpose. So the Ninth Circuit's model instruction, which is the basis for the requested instruction, is derived from a Ninth Circuit case called Banks. And in that case, that's where they kind of created this substantial purpose language, even though it doesn't appear in the statute. And in this case, the district court's instruction was consistent with the model instructions of numerous circuits. I think the Ninth Circuit's instruction is actually the outlier here. And so we don't think the district court abused its discretion in giving the instruction that it did. I wanted to address the existence of the enterprise issue. It's important to note that the Vicar statute defines an enterprise to include any group of individuals associated in fact. And the key Supreme Court case on that is Boyle, where the court addressed there was a circuit split essentially that does the enterprise need some kind of structure distinct from the racketeering activity. And the Supreme Court said no. And in doing so, the court explained, and frankly, I think how simple an enterprise actually is. The Supreme Court said it needs three things to be an enterprise. And in Boyle, they were addressing the RICO statute, but the definition of enterprise under RICO and Vicar are the same, and courts treat them as interchangeable. But Boyle said that an enterprise requires three structural features, a purpose, a relationship among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose. We think all of those were established here. Judge Strauss, to your point, gang members don't wear shirts that say gang member. Sometimes they get close, frankly, but as Detective George and Detective Minahan both testified, in their work in doing gang investigations, they're identifying associations, an association in fact. Are these people hanging out together? Do we see them repeatedly committing crimes together? Are they committing crimes against the same kind of opposition groups? And that's the kind of evidence that was presented in this case, was that these were a group of individuals that were constantly together. And the record is replete with social media photos and videos of Yuri Green with Raekwon Patton, with Braden Schaefer, with Fabrice Turner. They're constantly together with weapons, with drugs, flashing gang signs. And they all, according to the testimony, had the same opposition gang members. It was C-Block and C-Block subsets. And I wanted to address, regarding the enterprise, I believe Ms. Frank stated in her argument that there was no evidence that Yuri Green was part of OTB. And I just wanted to point out that witness Anthony Brown testified directly that Yuri Green was a member of OTB. And when Ms. Frank pressed him on how he knew that, he said, well, I hang out with him. I grew up around him. And he'd seen him throw it up, meaning throwing up the gang signs associated with OTB. And I think, putting aside the fact that Anthony Brown directly testified that Yuri Green was a member of OTB, Detective George and Detective Minahan both testified that Yuri Green was frequently in the presence of known OTB members and associates. And they'd seen him with those individuals over time consistently. And that's corroborated by the social media evidence that was presented at trial. If there are no further questions from the panel, I will rely on the government's brief on the remaining issues. Very well. Thank you. Thank you. The balance counsel pretty much used their time. I think one might have a little bit left. But I'll allow each of you one minute if you want to have something very succinctly you need to respond to. Mr. Riggs. Sorry, Mr. Kleinfeld. Your Honor, thank you very much. I want to make two points. First, one cannot understate the importance of being able to call Geronte Rankin to the stand, the alternative suspect in that case. He would have not only testified that nobody in that car knew, in other words, it would not have been clear to even Austin Mallory what was about to happen, which is an essential element for the government, but he would have sat there next to the jury, the same way he sat there next to Austin Mallory that day, and the jury would have gotten to seeing what it would have been like for Austin Mallory, why he let Geronte Rankin drive his car, why he switched seats with Geronte Rankin after the shooting happened, why he didn't correct Detective George when he made the erroneous assumption that Mallory was driving during the shooting, and why he admitted to Detective George and falsely took responsibility after Detective George emphasized to him that Geronte Rankin is a dangerous gang member. The importance of that cannot be overstated. And why this young man, 18 years old, who had never been in trouble before in this gang on the record, is shooting up houses for cooperators. He lives with his mother and two sisters. Very well. Thank you, Mr. Kleinfeld. Mr. Rankin. Thank you, Your Honor. Three things. First of all, to the argument that he only shot at Mr. Nelson and so justification doesn't apply. Either Mr. Nelson was present and we don't know who the shooter at the sidewalk was, so it was either Mr. Nelson, somebody Mr. Nelson contacted, or somebody completely independent. One of those three is it was Mr. Nelson, which means shooting at Mr. Nelson without telling the jury that the government also has to prove that it wasn't justified never got presented to the jury. Second thing, the government said, well, it could have been another forceful felony. But did you notice they never mentioned what that other forceful felony was? That's because there wasn't one. Third thing, on the purpose element, the purpose element that we asked for is the minimum that needs to be required in order for you to make a purpose element. That's what the jury needed to know. This is something where there's a reaction. Was he reaction because he was maintaining status or was it not a substantial purpose or not? Thank you. Thank you, Mr. Rigg. Ms. Frank. Thank you. I would just like to briefly address Mr. Lemkew's comments with regard to whether or not my client was OTB or an associate of OTB. The problem was is that Terence Denton, who was my client's cousin, didn't know him to be OTB or belong to any specific group. Brown, who, according to Mr. Lemkew, testified that he knew he was OTB, also testified he heard that he was OTB. He may have seen him be friendly with OTB members, hang out with them, but that doesn't make him part of the enterprise. And Bauer Turner, who was authentic OTB, he had it tattooed on his face, said that Mr. Green was not OTB and had never asked to join or had been never asked to join OTB. The point is the government had the burden of proving the enterprise was specificity and the manner in which the evidence was presented had no specificity and, therefore, was not a group working in coordination with each other. Thank you. Thank you, Ms. Frank. The court appreciates the appearance of all counsel in your arguments. There's a lot of issues. We'll wrestle with it and issue an opinion in due course. You may be excused. Thank you, Your Honor.